**Sheldon K. BEREN et al., Appellants,**

**v.**

**HARPER OIL COMPANY, a corporation, et al., Appellees.**

**No. 47752.**

Court of Appeals of Oklahoma,
Division No. 1.

Aug. 5, 1975.

As Corrected on Limited Grant of Certiorari,
Nov. 10, 1975.

Rehearing Denied Sept. 30, 1975.

Released for Publication by Order of Court
of Appeals Feb. 26, 1976.

Watson, McKenzie & Dunlevy, H. B. Watson, Jr., John C. Moricoli, Jr., Oklahoma City, for appellants.

C. Harold Thweatt, Oklahoma City, for appellee Champlin Petroleum Co.

Richard E. Terry, Chicago, Ill., and Coleman H. Hayes, Oklahoma City, for appellees Harper Oil Co. and Viersen & Cochran, a partnership composed of Sam K. Viersen and Sam K. Viersen, Jr.

REYNOLDS, Judge:

An appeal by Sheldon K. Beren, Robert M. Beren and Okmar Oil Company, a partnership composed of Adolph Beren, H. H. Beren and I. H. Beren, Appellants, from a judgment for Harper Oil Company, a corporation, Champlin Petroleum Company, a corporation, and Viersen & Cochran, a partnership composed of Sam K. Viersen and Sam K. Viersen, Jr., Appellees.

The appellants (Okmar Oil Company) co-owned 25% working interest in an oil and gas drilling and spacing unit. Okmar's action was for an accounting and cash money judgment. Judgment was rendered for the defendants, Harper Oil Company (Harper), Viersen & Cochran, a partnership composed of Sam K. Viersen and Sam K. Viersen, Jr. (Viersen & Cochran), Champlin Oil & Refining Company (now Champlin Petroleum Company, Champlin),

Sinclair Oil & Gas Company (now Atlantic Richfield Oil Company by virtue of merger) and Shell Oil Company, who were the co-owners of oil and gas drilling rights created by oil and gas leases covering lands within a 640-acre drilling and spacing unit created by an order of the Corporation Commission, No. 41,933, establishing 640-acre drilling and spacing units for the production of gas and gas condensate from the Mississippian formation underlying Section 25, Township 22 North, Range 8 West, Garfield County, Oklahoma, entered into an operating agreement for the mutual development of the unit acreage.

Under the operating agreement, each party reserved the right to market its respective portion of the unit production.

Pursuant to said operating agreement, the parties owned interests in the following proportions:

| | |
|---|---|
| Harper Oil Company | 12.5% |
| Viersen & Cochran | 12.5% |
| Champlin Oil & Refining Co. | 25 % |
| Sinclair Oil & Gas Co. | 25 % |
| Shell Oil Company (Okmar) | 25 % |

A unit gas well was completed (Hodgen Unit # 1 well—August 9, 1964). Harper, Viersen & Cochran and Champlin sold their gas to Arkansas Louisiana Gas Company (Arkla). Sinclair and Shell sold their gas to Oklahoma Natural Gas Company (ONG). Because of the gas commitment to different purchasers, a so-called "split connection" was created at the well. In other words, there were two gas purchasers connected to the well rather than one.

Under the terms of the operating agreement, at paragraph 13 hereinafter set forth, each set of selling parties had the right to sell gas, and each of the two gas purchasers had the right to take gas from the well for the account of their respective sellers.

"13. Right to Take Production
in Kind

"Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating oil for marketing purposes and production unavoidably lost. Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold the other parties free from any liability therefor. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.

"Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production.

"In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Unit Area, Operator shall have the right, subject to revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others for the time being, at not less than the market price prevailing in the area, which shall in no event be less than the price which Operator receives for its portion of the oil and gas produced from the Unit Area. Any such purchase or sale by Operator shall be subject always to the right of the owner of the producion to exercise at any time its right to take in kind, or separately dispose of, its share of all oil and gas not previously delivered to a purchaser. Notwithstanding the foregoing, Operator shall not make a sale into interstate commerce of any other party's share of gas production without first giving such other party sixty (60) days notice of such intended sale."

The takes from the well by the gas purchasers were consensual. No volume limitation was imposed upon either purchaser, it apparently having been assumed by the sellers that in the course of events the volumes as between the gas purchasers would equalize.

Okmar by purchase on May 19, 1966, acquired the rights of Shell Oil Company, subject to the operating agreement and subject to the split stream arrangement.

Because of high line pressure, ONG did not take all the gas that was attributable to the interest of its sellers. This failure to take resulted in a substantial "imbalance" among the owners of the gas production.

The parties are in agreement as to the interest of 25% that is owned by Okmar, and that Okmar has paid its proportionate part of the operating expense of the unit; that reporting has been made periodically by Harper, et al. to Okmar as to the amount of gas that Okmar is underproduced, and the amount that Harper, et al. is overproduced.

In 1971, Okmar cancelled the gas sales contract to ONG, and thereafter their percentage of the gas was contracted to Arkla. Okmar has been receiving its pro-rata share since 1971.

The parties entered into no arrangement to "balance" among themselves any inequalities which might result from gas deliveries to the respective purchasers that were not proportionate to the ownership of the sellers in the well and the gas produced therefrom. The question of "balancing" was left open.

In *Wolfe v. Texas Co.*, 10 Cir., 83 F.2d 425, the court held:

▮▮▮▮ Parties to a contract are presumed to know a well-defined trade usage generally adopted by those engaged in the business to which the contract relates.

▮▮▮▮ Persons, who enter into a contract in the ordinary course of business, unless the terms of the contract indicate a contrary intention, are presumed to have incorporated therein any applicable, existing general trade usage relating to such business."

The model form operating agreement (Form 610) provides at Paragraph 21 the following:

### "21. Liability of Parties

"The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. *It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners."* (Emphasis added.)

Notwithstanding paragraph 21 of the operating agreement set out above, the operator has a responsibility to the co-owners. Kirby Ellis commented in his article "The Production of Gas from Joint Interest Properties", 21st Southwestern Legal Foundation Institute on Oil and Gas Law and Taxation, "Policing by Operator", as follows:

"It is a continuing problem to maintain reservoir balance, and the operator of the unit should police the deliveries in order to maintain at all times reasonable reservoir balance. It should be remembered that the operator of the unit, unless the operating agreement otherwise provides, has the exclusive right and obligation to conduct unit operations. He is obligated to conduct all such unit operations in a good and workmanlike manner as would a prudent operator under the same or similar circumstances. Maintaining reasonable reservoir balance

to insure that each operator receives his proportionate part of production from jointly owned or operated properties should certainly satisfy the test of prudence."

In the instant case the operator Harper could not "balance" the take of the two gas purchasers due to the high line pressure of ONG. Okmar knew it was under contract to ONG, and took no action to install a compressor or to terminate its contract until 1971. The operator had no alternative than to sell the gas produced from the reservoir to the appellees' purchaser.

The villain (split connection) has now been eliminated. It is stipulated that Okmar is underproduced by 163,702 MCF. The question remains as to how shall the underproduced Okmar be brought into "balance" with appellees.

The commentators in the field of oil and gas law have recognized the problem[1] Three methods of bringing the underproduced party into balance are recommended:

1. Balancing in kind. A balancing in volumes. In effect the underproduced party takes a certain percentage of the overproduced party's gas until the "imbalance" has been "made up."

2. Periodic cash balancing. Here, the underproduced party receives cash, and the well is immediately brought into balance.

3. Cash balancing upon reservoir depletion. The parties endeavor to maintain a reservoir balance during the life of the well, and on depletion, the overproduced party accounts to the underproduced party in cash.

Since 1913, Oklahoma has regulated the taking of natural gas from underground sources. Its statutes provide that the Corporation Commission shall prescribe rules and regulations to regulate the taking of natural gas from a common source of supply to prevent waste, protect the interest of the public, and prevent unreasonable discrimination between those entitled to produce from the common source of supply. 52 O.S.1971, § 239; *Oklahoma Natural Gas Co. v. Texola Drilling Co.*, 10 Cir., 214 F.2d 529.

The Corporation Commission of Oklahoma has the authority to provide for a ratable taking of gas to protect the correlative rights of those entitled to take from a common reservoir or common source of supply. Throughout the history of the oil and gas industry there have been situations of balance and imbalance in the taking of gas. These inequities are customarily settled "in kind" between the co-owners, or by the Corporation Commission of Oklahoma.

The expert witness of appellees, Mr. C. E. Beavers, testified:

"It is the custom to permit if at all possible, the underproduced party to take his increased share of gas production in kind and dispose of it as he sees fit. Now then, once a well depletes and production can no longer be obtained, then again it is the custom in the industry for there to be a cash balancing between the parties."

It is a matter of common knowledge that when a split connection exists there will be differences in the "take" by the separate purchasers. It is the general custom and usage in the gas industry that "the take" be balanced in kind if possible.

In *Smith v. Owens*, 397 P.2d 673 (Okla. 1963), the Oklahoma Supreme Court held:

"In the case of equitable cognizance, where the judgment of the trial court is clearly against the weight of the evidence or contrary to the law applicable thereto, this Court will reverse such judgment or decree, or render or cause to be rendered such judgment and decree as the trial court should have rendered.

---

1. 21 Southwestern Legal Institute on Oil and Gas Law & Taxation 77–80. 16 Southwestern Legal Institute on Oil and Gas Law & Taxation 266.

See *Federal National Mortgage Association v. Walter,* Okl., 363 P.2d 293."

While balancing in kind, based on custom and usage, may be apropos in many instances where imbalance exists, under the particular facts of this case which establish that the well is depleting; that this cause of imbalance, i. e., the split connection, has been eliminated and there is no immediately foreseeable continued imbalancing in production because there is but one purchaser of gas from the well; the equities dictate an immediate accounting and cash balancing between the owners of interest in the well.

Cause Reversed and Remanded with Directions to enter Judgment in favor of appellant for an accounting and upon accounting, to enter money judgment in favor of appellant for the value of underproduced gas.

Remanded with instructions.

ROMANG, P. J., and BOX, J., concur.