UNITED PETROLEUM EXPLORATION, INC., a corporation, Rita Goldstein Leinfuss, John Gianacopolos, Mary Gianacopolos, Pauline McKinnon, Nelson H. Wilhelm, Fred A. Mayer, Frances M. Pappas, William J. Pappas, and Joan A. Royce, Plaintiffs,

v.

PREMIER RESOURCES, LTD., a Colorado limited partnership, and Northern Natural Gas Company, a corporation, Defendants.

No. CIV–79–423–T.

United States District Court, W. D. Oklahoma.

Dec. 29, 1980.

Richard K. Books, H. B. Watson, Oklahoma City, Okl., for plaintiffs.

Charles Nesbitt, Oklahoma City, Okl., for defendants.

## MEMORANDUM OPINION

RALPH G. THOMPSON, District Judge.

Plaintiffs (hereafter referred to as "plaintiffs" or "United") commenced this action alleging two claims for relief against the defendants. The first claim seeks an accounting from the defendants for alleged over-production of gas and gas condensate by the defendants from the Barth G015 well located in Section 9, Township 24 North, Range 26 West, Ellis County, Oklahoma, which produces from the Morrow Sand. Plaintiffs' second claim for relief seeks the appointment of a permanent receiver to replace defendant Premier Resources, Ltd. (hereafter referred to as "Premier") as the operator of this well. This action is now before the Court for consideration of cross motions for summary judgment as to plaintiffs' first claim for relief. The parties have filed briefs in support of their respective positions and have jointly submitted a stipulation of facts.

Defendant Premier is the owner of 28.4458% leasehold interest in the Barth well. Defendant Northern Natural Gas Company (hereafter referred to as "Northern") owns no interest in the Barth well but is the contractual purchaser of Premier's share of the production therefrom. Plaintiffs are the owners of 45.4369% leasehold interest in the Barth well. 26.1173% of the leasehold interest in the Barth well is owned by persons not parties to this action but whose interests were acquired through investment in plaintiff United Petroleum Exploration, Inc.

On December 9, 1976, the production of gas from the Barth well was brought into balance by a judgment from the District Court of Ellis County, Oklahoma. From that date until June 9, 1977, Premier sold the entire production of gas from the Barth well to its purchaser Northern. On June 10, 1977, plaintiffs provided a pipeline connection to the Barth well with Michigan Wisconsin Pipe Line Company and began selling their proportionate share of production to Michigan Wisconsin Pipe Line Company. From June 10, 1977, to the present, the production from the Barth well has been effectively in balance but for the overproduction by Premier from December 9, 1976, through June 9, 1977.

In support of their motion for summary judgment, plaintiffs contend that Premier's overproduction from the Barth well has caused damage to United's correlative rights. United asserts that the proper remedy to protect its correlative rights is an order balancing the production from the Barth Well. To this end, United asserts it is entitled to bring the Barth well into overall balance by either a taking of gas in kind, or an accounting from Premier for a current cash balancing of the gas volume for which the Barth well is out of balance.

United relies primarily upon the case of *Beren v. Harper Oil Co.*, 546 P.2d 1356 (Okl.App.1975).

In opposition to plaintiffs' motion, and in support of its own motion for summary judgment, Premier asserts that United had the right to take gas in kind from the Barth well but that right was contingent upon Premier's purchaser making a physical connection to the well. Premier argues that it sold all the production of the Barth well to its contractual purchaser for the period from December 10, 1976, through June 9, 1977 and received the proceeds of those sales. Premier claims that it currently holds that portion of the proceeds received which is not attributable to its own interest, but that it has not been paid due to United's refusal to accept. Premier's position is that it had the right to sell the entire production from the Barth well and account to United for United's share of the proceeds until such time as United was capable of taking gas in kind. Premier argues that the unitization of the Barth well required it, as the operator, to produce and market the gas from the Barth well for the benefit of all owners of an interest in the unit pool. In support of this position, Premier cites *Earp v. Midcontinent Petroleum Corp.*, 167 Okl. 86, 27 P.2d 855 (1933); *Barton v. Cleary Petroleum Corp.*, 566 P.2d 462 (Okl. App.1977); and *Dilworth v. Fortier*, 405 P.2d 38 (Okl.1974) among others. Premier asserts that correlative rights are not involved in this dispute and that *Beren v. Harper Oil Corp.*, supra is not supportive of United's position. Finally, Premier contends it is entitled to a reasonable attorney's fee due to United's refusal to accept Premier's tender of United's proportionate share of the gas sale proceeds.

In opposition to Premier's motion for summary judgment, United asserts that the creation of the drilling and spacing unit upon which the Barth well is located did not result in the creation of a co-tenancy among those lessees covered by the order of the Corporation Commission. As authority United cites *Wakefield v. State*, 306 P.2d 305 (Okl.1957); *Anderson v. Corporation Commission*, 327 P.2d 699 (Okl.1957); *ap-*

*peal dismissed*, 358 U.S. 642, 79 S.Ct. 536, 3 L.Ed.2d 567 (1959); and *Amis v. Bryan Petroleum Corp.*, 90 P.2d 936 (Okl.1939). Moreover, United asserts, even if a co-tenancy was created, requiring a party to provide appropriate facilities for capture, as a precondition to the actual taking of gas in kind, places owners of oil and gas interests at the mercy of third parties such as pipeline purchasers. Further, United reasserts that its correlative rights have been injured and argues that Premier is not entitled to an award of attorney's fees.

The threshold issue presented here is whether Premier's unbalanced production of gas from the Barth well from December 10, 1976 through June 9, 1977 constitutes an infringement upon the correlative rights of United. To determine this, it is necessary to understand what correlative rights are. In *Kingwood Oil Co. v. Corporation Commission*, 396 P.2d 1008 (Okl.1964), the Oklahoma Supreme Court stated:

> "The term 'correlative rights' has been defined as a convenient method of indicating that each owner of land in a common source of supply of oil and gas has legal privileges as against other owners of land therein to take oil and gas therefrom by lawful operations conducted on his own land, limited, however, by duties to other owners not to injure the source of supply and by duties not to take an undue proportion of the oil and gas. Summers, Oil and Gas, Vol. 1, Sec. 63." 396 P.2d at 1010.

From this it can be seen that correlative rights are those rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply. At this point, it must be emphasized that a common source of supply in which the owners of mineral interests possess correlative rights is the underlying geological strata from which the oil and gas is produced, rather than the well through which the oil and gas is reduced to possession. See, 52 Okla.Stat.1971 § 86.1(c).

■ United asserts that Premier's overproduction of gas from the Barth well has damaged United's correlative right to production. In support of this assertion, United has cited Professor Kuntz as follows:

"The right to a fair opportunity to extract oil or gas from a common source of supply has been clearly recognized as a correlative right which must be protected when conservation regulations are imposed which limit the operation of the law of capture. When the right to produce oil and gas is denied or curtailed by conservation regulation, measures must be taken to assure owners equal opportunity to enjoy their fair share of production, and a denial of such equal opportunity would amount to confiscation." 1 Kuntz, *Oil and Gas*, § 47, page 102 (1962.)

However, the denial of the correlative right to extract oil or gas, which is referred to by Professor Kuntz, does not mean that the operator of an oil and gas well violates the correlative rights of other interest owners when it obtains a disproportionate share of the production. What Professor Kuntz has stated is that a governmental entity, such as a state, cannot restrict the right of a mineral interest owner from obtaining its fair share of the actual production from a pooled well when the amount of oil or gas permitted to be reduced to possession through that well·is restricted for conservation purposes.

The dispute between these parties is not that Premier's actions in reducing to possession a quantity of gas has resulted in a hampering of United's ability to conduct its own operation to obtain possession of a quantity of gas from the same supply source. Rather, this dispute is over whether a part owner of a producing gas well can disclaim title to that portion of the production occurring while it is physically unable to take possession of its fair share, and assert instead an absolute ownership over a mathematically balanced volume of production *after* possession capability is provided.

While the *Beren* case, relied upon by United, does not reflect precedential authority concerning Oklahoma law, 20 Okla. Stat.1971 § 30.5; *Russell v. Atlas Van Lines, Inc.*, 411 F.Supp. 111 (E.D.Okl.1976), the case does represent persuasive authority. This Court is convinced that the reasoning applied by the court in *Beren* is sound and should be followed.

In *Beren*, the court concluded that the equitable considerations required an immediate cash balancing of the well rather than a balancing in kind. In reaching this conclusion, the court stated:

"While balancing in kind, based on custom and usage, may be apropos in many instances where imbalance exists, under the particular facts of this case which establish that the well is depleting; that this cause of imbalance, i. e., the split connection, has been eliminated and there is no immediately foreseeable continued imbalancing in production because there is but one purchaser of gas from the well; the equities dictate an immediate accounting and cash balancing between the owners of interest in the well." 546 P.2d at 1360.

Thus, it is apparent from the language of the *Beren* court that an examination of the particular circumstances of each case must be considered in determining the method of balancing to be used.

Professor Kuntz has discussed the *Beren* case by stating:

"[A type of split stream problem] occurs when the lessees do not market gas ratably from the unit and accordingly create an 'imbalance' in the gas which they have taken. The methods commonly used to restore a balance have been described as follows:

'1. Balancing in kind. A balancing in volumes. In effect the underproduced party takes a certain percentage of the overproduced party's gas until the 'imbalance' has been 'made up.'

2. Periodic cash balancing. Here, the underproduced party receives cash, and the well is immediately brought into balance.

3. Cash balancing upon reservoir depletion. The parties endeavor to main-

tain a reservoir balance during the life of the well, and on depletion, the overproduced party accounts to the underproduced party in cash.' [Citing *Beren*.]

It has been judicially recognized that the general custom in the industry is to balance in kind if possible, but it has been held that cash balancing is proper and should be ordered when the well is 'depleting' and the cause of the imbalance has been removed. [Citing *Beren*.] When balancing is to be done in cash, a value of the gas must be established for such purpose. It is submitted that, in the absence of special circumstances and intervening equities, the price used for cash balancing should be the price which the underproduced party would have received for his gas if it had been marketed currently. This solution has the merit of restoring the underproduced party to the position which he would have occupied if the imbalance had not occurred. Special circumstances might dictate that the price received by the lessee who overproduced be taken into account. Further, fairness may dictate that the lower or higher of the two prices be used, depending upon factors such as the deliberate conduct and diligence, or lack of diligence of the parties in creating the imbalance. If the conduct of the overproduced lessee amounted to a conversion of the gas, the measure of damages for conversion should be applied rather than a balancing." 5 Kuntz, *Oil and Gas*, § 77.3, pages 408–9 (1978).

█ The general custom of the industry to balance in kind, if possible, should not be afforded a greater preference than a cash balancing when a balancing in kind would be inequitable to any party. Rather, the method of balancing chosen should reflect an intention by the Court to restore the underproduced party to the position which he would have occupied if the imbalance had not occurred.

Thus, the determination of whether this well should be brought into balance by a balancing in kind or a cash balancing turns on which of the two methods will most nearly restore United to the position it otherwise would have occupied if the imbalance had not occurred.

The imbalance complained of here could have been avoided in two ways. First, United could have provided compression equipment and taken its share in kind during the period of time prior to the establishment of a pipeline connection at the wellhead. Second, United could have accepted a cash balancing during this period.

In many respects, this case is quite similar to the *Beren* case. In *Beren*, the Oklahoma Court of Appeals noted that the appellants took no action to obtain a balancing in kind by installing compression equipment, or otherwise seeking to remove the existing impediments to a balancing in kind. The court concluded that "the operator had no alternative than to sell the gas produced from the reservoir to the appellee's purchaser." 546 P.2d at 1359. In the case *sub judice*, plaintiffs determined that they would prefer to balance the well production by a taking in kind, and then, for a period of several months, failed to provide the facilities which would have permitted such a balancing. United could not balance the take by a taking in kind through a pipeline connection at the wellhead, due to the lack of such a pipeline connection from its contractual purchaser. Moreover, United took no action to otherwise take possession of its share of the gas produced. Premier had no alternative than to sell the gas produced to its purchaser, Northern.

█ For balancing in kind to be appropriate, adequate provisions must be made to actually receive delivery of the production in kind. See, 52 Okla.Stat.1971 § 287.9, wherein delivery of unit production in kind is expressly conditioned upon adequate provision being made for the receipt thereof. Thus, when a participant in a unitized production well elects to receive its fair share of the well's production in the form of production in kind, the facilities necessary to receive such production in kind must actually exist and be available.

■ The alleged imbalance in this case is, in large measure, a fiction. It resulted only because the plaintiffs chose to refuse to permit the well to be balanced by the only means then available. That they may have anticipated an alternative means in the near future did not entitle plaintiffs to refuse a current balancing. Construction delays of nearly any kind could have occurred, preventing plaintiffs' establishment of a split stream connection for a period of time. When plaintiffs chose to refuse a current cash balancing, a split stream connection to the wellhead was in the offing. However, stating when the split stream connection would be established was, at best, speculative. It is also important to recognize the precise language used by the *Beren* court:

"It is a matter of common knowledge that when a split stream connection exists there will be differences in the 'take' by the separate purchasers. It is the general custom and usage in the gas industry that 'the take' be balanced in kind if possible." 546 P.2d at 1359.

It must be noted that balancing the production in kind is expressly conditioned, by the *Beren* court, upon the existence of a split stream connection. In this case, no split stream connection, or viable alternative, existed until June 10, 1977. Consequently, balancing in kind is not an appropriate remedy.

■ The final issue is: is the value of the gas produced, and for which the producer must account to the other interest owners, determined on the basis of the fair market value of the gas or the price which the operator actually received for the gas? In regard to the issue, the parties have cited no pertinent authorities. Premier has cited, however, several authorities for the proposition that it was under a positive legal obligation to market the production from the Barth well.

In this particular instance, Premier sold all of the gas produced to its contractual purchaser. As such, the price Premier received for the gas was established pursuant to the contract between itself and North-

ern. United was able to negotiate a better price for its share of the gas through another purchaser and arrangements were made to have United's purchaser acquire possession at the well of the appropriate share of production. Thus, to the extent that United was dissatisfied with the price obtained for its share of the production, it undertook a self-help remedy to market its own production share. While there is evidence that the fair market value of the gas was greater than the contractual value being paid, there is nothing in the record to indicate a factual dispute that the price received by Premier for the gas produced was less than the fair market value of the gas *at the time Premier entered into its contract with Northern*. Thus, there is nothing to indicate that Premier has breached its duty to diligently market the gas produced. Accordingly, the cash balancing to which the parties are entitled will be determined on the basis of the actual price received by Premier for the gas sold.

■ To the extent that the parties each seek to recover attorney's fees or interest, the Court concludes that United is not entitled to recover interest upon the sums due, as it has consistently refused to accept tender of such sums. Further, Premier is not entitled to recover its attorney's fees pursuant to 12 Okla.Stat.1971 § 1101, as this action was not commenced by plaintiffs for the purpose of receiving money only. Rather, plaintiffs sought to recover severable realty as an alternative to monetary compensation.

Accordingly, it is the conclusion of the Court that the defendant Premier is entitled to have its Motion for Summary Judgment granted as to plaintiffs' first claim for relief and that plaintiffs' Motion for Summary Judgment be denied. The parties are entitled to a cash balancing of the Barth well, through June 9, 1977, on the basis of the actual value received for the gas sold by Premier. Judgment will be so entered at the appropriate time with all parties to bear their own costs.