**POGO PRODUCING COMPANY,**
**Plaintiff–Appellant,**

v.

**SHELL OFFSHORE, INC.,**
**Defendant–Appellee.**

No. 89–3318.

United States Court of Appeals,
Fifth Circuit.

April 26, 1990.

---

David R. Richardson and Kenneth J. Servay, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for plaintiff-appellant.

John T. McMahon and George J. Domas and Robert L. Theriot, Liskow & Lewis, New Orleans, La., for defendant-appellee.

Before HIGGINBOTHAM, SMITH and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

Pogo Producing Company appeals the dismissal of its complaint seeking a cash recovery from Shell Offshore, Inc. for natural gas overproduced by Shell. We affirm.

In October 1979 Pogo, Shell, and several others executed an operating agreement governing the production of oil and gas from a federal lease on the outer continental shelf of the United States. Shell was designated the operator under the agreement. Section 10.4 of the agreement states:

> Any party's failure to timely take or sell its share of gas production shall not prohibit the other party or parties from producing their share of production, *provided that non-producing party or parties may recoup or recover their share from future production and/or in cash by suitable agreement.*

Under a 1975 settlement agreement Pogo was obligated to offer United Gas Pipeline Company the right of first refusal to purchase Pogo's gas from the offshore lease. Accordingly, while the other lessees agreed to sell their shares of production to Tennessee Gas Pipeline Company, United elected to purchase from Pogo and the two parties entered into a gas sales contract in June 1982. When production commenced in July, however, United did not have a pipeline connection to the lease and was therefore unable to take deliveries of Pogo's gas. No deliveries were made under the United/Pogo contract, and the contract was rescinded in January 1985. Pogo began deliveries of gas to Texas Eastern Transmission Corporation in February 1985.

During the period Pogo was unable to deliver gas it did not take its share of production, and imbalances continued to some extent after Pogo began selling to Texas Eastern. Shell and Pogo corresponded through the end of 1986 regarding the imbalances in production. The main point of dispute was a gas balancing agreement executed by all lessees except Pogo. Pogo objected to a provision of the balancing agreement which required an underproduced party who commenced to take "makeup gas" to remit to the operator any difference in value between the makeup gas and the value of the gas when taken by the overproduced party. Pogo initially asked Shell to balance in kind, but later sought a one-time cash settlement for its underproduction. Shell refused to make a cash settlement and urged Pogo to join the balancing agreement.

In June 1987 Shell transferred its interest in the property to Hughes–Denny Offshore Exploration, Inc., and others (the "Hughes–Denny group"). As part of the transfer the Hughes–Denny group assumed Shell's rights and obligations under the operating agreement subject to Pogo's right to recover its imbalance.

Pogo sued Shell seeking a cash recovery for approximately 2,000,000 Mcf of underproduced natural gas. Both parties moved for summary judgment. The district judge denied Pogo's motion and granted Shell's motion, concluding that under section 10.4 of the Operating Agreement the parties had simply made an "agreement to agree,"

and that in the absence of an agreement the custom and usage of the industry required balancing in kind. The judge found no reason to believe that balancing in kind would be inequitable to either party, and accordingly dismissed the complaint.

### Obligation to Balance in Kind

Pogo offers several grounds to support its assertion that the district judge improperly concluded balancing in kind was the appropriate remedy. Pogo first argues that no evidence supports the district judge's inference that Pogo was "playing the market" and demanding cash balancing in order to gain a better recovery after a decline in gas prices. The judge, however, made no finding on the evidence regarding Pogo's motives, but simply commented that the rule favoring balancing in kind, as a general matter, discourages an underproduced party from alternatively demanding balancing in cash or in kind as the market favors him.

Pogo next argues that under Louisiana law a court should order cash balancing at the price received by the overproduced party when the underproduced party, through no fault of its own, is shut in without a market for its gas. The argument does not accord with Louisiana law. A recent case concerned an order of the Louisiana Commissioner of Conservation providing in part for the accounting among co-owners for production from a compulsory drilling and production unit. The court commented:

> The preferred method of judicial partition is partition *in kind*, wherein each co-owner receives his proportionate share of the common property.... However, partition in kind cannot be utilized when the common property is indivisible or when it cannot be conveniently divided.... Common property cannot be conveniently divided in kind if a diminution of value occurs (a diminution in value occurs when the total value of the parts is less than the value of the property as a whole), or if the division in kind causes loss or inconvenience to one of the owners.

*Amoco Prod. Co. v. Thompson,* 516 So.2d 376, 388 (La.App. 1st Cir.1987) (citations omitted) (emphasis in original), *writ denied,* 520 So.2d 118 (La.1988). The court also cited certain provisions of the Conservation Law which give the Commissioner of Conservation the authority to modify the right to take in kind. These provisions govern circumstances in which taking in kind (1) causes waste, (2) precludes another owner from recovering or receiving his just and equitable share, or (3) infringes on the correlative rights of another owner by limiting his liberty to enjoy his rights or causing damage to him. *Id.* at 393. The court commented that these principles "are consistent with the mutual rights and obligations of all owners in indivision." *Id.* at 393 n. 5.

On remand the Commissioner of Conservation found that during a certain critical period in which the non-producing owners did not have a viable market for their gas, "partition in kind would adversely affect the rights of the non-taking owners to take their just and equitable shares in kind, and would adversely affect their correlative rights." Supplement to Office of Conservation Order Nos. 1102, 1102–A, 1102–A–1, 1102–A–2, 1102–A–3, and 1102–A–4, at 7, 8 (December 14, 1988). On appeal the district court concluded that the Commissioner's determination was contrary to the decision of the Court of Appeals, since the administrative record indicated that the gas remaining in each unit was sufficient to provide each owner with his fair share of gas production. *Amoco Prod. Co. v. Thompson,* No. 283,872 (La. 19th Jud. Dist.Ct. Oct. 10, 1989). The disposition by the district court is consistent with the holding of the Court of Appeals, which commented:

> If, in taking their share in kind, some owners deplete the unit, then those owners who did not get their share in kind prior to depletion may be entitled to a cash accounting. However, if the unit is not depleted and the gas remaining in the unit is enough to provide each owner with his fair share (if properly balanced),

then a balancing in kind accounting may be appropriate.

*Amoco,* 516 So.2d at 394.

■ In short, balancing in kind is the preferred method of remedying underproduction. Though circumstances may exist which make balancing in kind inequitable, Pogo's assertion that it is entitled to cash balancing simply by virtue of its inability to market its gas is not supported in the law. This is particularly true in view of the fact that the property at issue is not nearing depletion.

■ Pogo next argues that the disposition of the district court is contrary to two provisions of the operating agreement. Pogo believes that the force majeure clause, which suspends a party's obligations for "arrests and restraints of government" among other events, excuses its underproduction. In particular Pogo points to a second provision which relieves a party of liability in the event government regulation hinders it from complying with the agreement:

20.1 All the terms and provisions of this Agreement are hereby expressly made subject to all Federal and State laws and to all orders, rules and regulations of any duly constituted authority having jurisdiction in the premises, and *no party hereto shall suffer a forfeiture* and be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any such law, order, rule or regulation.

(emphasis added). Pogo argues that its 1975 settlement agreement, which was approved by the Federal Power Commission and required it to offer its gas to United, falls within the protections of the two clauses and that the district court therefore erroneously caused it to suffer a "forfeiture."

Pogo's 1975 settlement agreement cannot constitute a force majeure. The force majeure clause requires a party to give notice to other parties "after the occurrence of the cause relied upon," and therefore assumes, sensibly, that the cause arises after the execution of the agreement. The settlement agreement requiring Pogo to offer its gas to United was approved by the Federal Power Commission four years before the operating agreement was executed. With respect to forfeiture, Pogo's argument presumes that balancing in cash is the correct method, and that Pogo suffers a forfeiture to the extent balancing in kind operates to its detriment over cash balancing. The argument therefore begs the question as to the appropriate method of balancing.

■ Pogo next argues that Shell breached its obligation to perform its duties as an operator in good faith. Louisiana law imposes upon contracting parties the obligation to perform contracts in good faith. La.Civ.Code arts. 1759, 1983. Pogo has cited no evidence that Shell failed to act in good faith. The operating agreement required the parties to resolve, by suitable agreement, the proper method of balancing in the event of underproduction. The record shows that Shell considered each of Pogo's proposals and suggested a counterproposal. Shell's repeated insistence that Pogo join the gas balancing agreement, to which all other producers had subscribed, is hardly evidence of bad faith since it shows only that Shell did not agree to Pogo's terms.

We do not address Pogo's final argument regarding the district court's reliance on two Oklahoma decisions. *See United Petroleum Exploration, Inc. v. Premier Resources, Ltd.,* 511 F.Supp. 127 (W.D.Okla. 1980); *Beren v. Harper Oil Co.,* 546 P.2d 1356 (Okla.Ct.App.1975). The judgment below is well supported by Louisiana law, and the Louisiana courts provide the proper forum for assessing the wisdom of the Oklahoma decisions.

### *Ability to Balance in Kind*

■ Pogo argues that Shell and the Hughes–Denny group are solidarily bound to render performance to Pogo, La.Civ. Code art. 1821, that Pogo may demand the whole performance of either obligor, *id.* art. 1795, and that after the sale of its

interest to the Hughes–Denny group Shell no longer was capable of balancing in kind. Pogo therefore argues that the district court rendered a judgment with which Shell is incapable of complying. The argument is without merit for two reasons. First, the district court did not order Shell to balance in kind; it merely dismissed Pogo's complaint. The court therefore did not order Shell to perform anything it was incapable of performing.[1] Second, while Pogo may certainly sue either Shell or the Hughes–Denny group for non-performance, the Civil Code permits a third person, even against the will of the obligee, to render performance unless the obligee has an interest in performance only by the obligor. *Id.* art. 1855. Pogo does not claim it has an interest in receiving performance from Shell alone. Indeed, non-performance in the future by either Shell or the Hughes–Denny group is not even at issue in this case, the sole issue below being whether Pogo was entitled to demand cash balancing of Shell.

### In Personam Jurisdiction

Pogo argues that the district court's judgment purports to bind the Hughes–Denny group and other co-producers of the property to balance in kind. As noted above, the district court simply dismissed Pogo's complaint and did not purport to order any particular party to perform.

### Forfeit of the Right to Choose

Pogo argues that an obligor has the right to choose the method of performance when the obligation is "alternative", La. Civ.Code art. 1809, but that when the obligor fails to exercise the choice after a demand to do so, the obligee may choose the performance, *id.* art. 1810. Pogo therefore argues that Shell lost the right to select the method of balancing and the choice reverted to Pogo.

The argument is without merit for two reasons. First, under Article 1810 the choice does not revert solely in favor of the obligee. The article states:

> When *the party who has the choice* does not exercise it after a demand to do so, *the other party* may choose the item of performance.

Shell responded to each of Pogo's proposals with a counterproposal. Using Pogo's analysis, Pogo's own failure to accede to Shell's counterproposals when Pogo had the choice of performance gave Shell the right to choose the method of balancing.

Second, the district judge correctly recognized that under section 10.4 of the operating agreement the parties made "an agreement to agree." Shell therefore could not choose the method of balancing without Pogo's consent, and Article 1809, which gives the choice of performance to the obligor, does not apply. Accordingly, Pogo's proposals for balancing did not constitute "demands" to exercise a choice under Article 1810.

The judgment is AFFIRMED.

---

1. The court was necessarily limited by the facts before it; it noted that balancing in kind was the preferred remedy and found no reason, on the basis of then-present circumstances, to depart from that remedy. This accounts for statements in its opinion to the effect that "'in kind' balancing is necessary in the instant case." Obviously, the future course of production from the property—depletion, for example—may render in-kind balancing impossible.