GADSCO, INC., an Oklahoma Corporation; Richard A. Tickle; Robert Q. Tickle; Robert L. Parker Trust; Elmer H. Lindquist; Don DeMoss; Scissortail Oil Co.; Guy B. Kiker Company; Guy B. Kiker; Oehl, Inc.; David R. Brown; Ann Noble Brown; Quien Sabe Corporation; E.E. Noble; Harry L. Brown, Jr.; Carol M. Brown; Romarco, Inc.; Jack E. Clark & Associates, Inc.; Kornfeld Petroleum Corp.; the Mary Dicey Trust # 2; the Mary Dicey Trust # 3; the Mary Dicey Trust # 4; the Bennie T. Estes Trust # 1; The Bennie T. Estes Trust # 2; Anoroco, Inc.; Shiloh Oil Corporation; Carlson Petroleum Company; F. Howard Walsh, Jr.; Kerr–McGee Corporation; Vince Allen Mu 80 Program Ltd.; Vince Allen Eta 78 Program Ltd.; Vince Allen & Associates; HFCO Coal Company; Shirley Huskins; Joseph F. Messenbaugh, III; North Custer Ltd. Partnership; John Muir Kipp; Jack Rich; Ogle Production Corp.; Clyde Hoeldtke, Jr. Trust; Kaiser–Francis Oil Company; Dasuma Corporation; G. William Ruppert; Susan Brown Ruppert; No–En–Co; Wm. Marbel Kipp, Trustee for the JEB Trust; Raymond Price; Lloyd Noble, II, Trustee of Lloyd Noble, II, Trust; David I. Greenberg; RPR, Inc.; Mary Ellen Dinaburg; Indrex, Inc.; Texinia Corporation; Vinegarone, Inc.; Howard Shipley; Sio Company; Noarko 1983–1–A Operating, a Limited Partnership; Texas Energies, Inc.; Masters Energy Corp.; and Cobb Oil and Gas Company, Appellants,

v.

TXO PRODUCTION CORP., a Delaware Corporation, Appellee.

No. 76331.

Court of Appeals of Oklahoma, Division 3.

April 7, 1992.

Rehearing Denied May 26, 1992.

Certiorari Denied Nov. 10, 1992.

David L. Fist, Mark S. Rains, Tulsa, for appellants.

Melinda J. Martin, Brian S. Gaskill, Kevin C. Leitch, Tulsa, for appellee.

## MEMORANDUM

JONES, Judge:

Appellants bring this appeal from the District Court's grant of summary judgment against the Appellants on the Appellant's motion. Several propositions of error were raised generally alleging the District Court erred by granting summary judgment in the face of controverted material facts and the Court also erred as a matter of law.

The Appellants (Gadsco and the other Non–Operators) and Appellee (TXO) are working interest owners in the Pyeatt No. 2 gas well in Custer County. An Operating Agreement was executed on July 16, 1975, naming TXO as operator. In 1976, TXO entered into a gas purchasing contract with Delhi, a wholly owned subsidiary of TXO. The negotiated price was $2.30 per MCF. The Non–Operators had their own purchase contract with Transwestern for a price of $4.00 per MCF.

In June, 1983, after the well was completed, TXO attempted to negotiate a purchase contract with Transwestern to sell its proportionate share of gas to Transwestern. Transwestern refused to purchase the gas from TXO. Then TXO refused to connect the well to the Delhi Pipeline. In order to induce TXO to connect the pipeline, the Non–Operators entered into an agreement whereby TXO could immediately share in the revenues from the Pyeatt Well and also take advantage of the higher MCF price.

A Letter Agreement (Gas Balancing Agreement) was executed on June 29, 1983, which provided that the Non–Operators would pay to TXO its proportional share of the net cash proceeds received from Transwestern for a period of two years, or until TXO began selling gas to its own purchaser, whichever came first. This time period was termed the "interim period". The total amount paid to TXO for the interim period would constitute a liability of TXO to the Non–Operators. At the end of the interim period, TXO agreed to produce and sell 100% of the gas. In return, Gadsco, on behalf of the Non–Operators, agreed not to produce but rely on repayment from TXO. TXO agreed to produce 100% of the gas until the total amount equaled the amount sold by Gadsco to Transwestern during the interim period. From the net proceeds, TXO agreed to repay a certain amount per MMBTU to Gadsco until the entire liability was fully repaid. After TXO had sold a volume of gas equal to the volume of gas sold by Gadsco during the interim period, Gadsco and TXO would then be entitled to produce and sell gas proportionate to their respective working interests. If, at that time, both TXO and Gadsco obtained gas purchase contracts, TXO agreed to install the equipment necessary for a split stream connection.

As agreed, Gadsco advanced a total amount of $1,369,532.00 to TXO between 1983 and 1985. This amount was based on TXO's 50% working interest in the well. An additional amount of $70,591 was inadvertently paid to TXO between September, 1985, and March, 1986. From February, 1986, to May, 1986, the well was shut in. On March 1, 1986, TXO entered into a gas purchasing agreement with TXO Gas Marketing Corporation (TGMC), a wholly owned subsidiary of TXO. On April 1, 1986, TXO and Delhi executed a termination contract which purported to end their 1976 contract, *retroactive* to 1983.

As agreed, TXO began selling 100% of the gas produced from the Pyeatt No. 2 well to TGMC in June, 1986. Also, in ac-

cordance with the agreement, Gadsco refrained from producing and selling any of the gas, expecting to be repaid the $1,369,532.00 advanced to TXO. Under the terms of TXO's agreement with TGMC, the repayment price was not fixed, but set at 98% of the Net Weighted Average Sales Price per MMBTU. TXO's gross receipts were thus dependent upon market fluctuations, but its obligation to Gadsco and the Non-Operators was fixed. The 1983 Gas Balancing Agreement required that the repayment rate would be calculated by dividing the volume of gas (in MMBTUs) sold by Gadsco to Transwestern during the interim period to arrive at a rate of $1.60 per MMBTU. However, contrary to the agreement, TXO never repaid its debt to Gadsco and the Non-Operators.

On October 13, 1987, Gadsco and the Non-Operators sued TXO for breach of the Gas Balancing Contract and for the overpayments made to TXO between September, 1985, and January, 1986. TXO counterclaimed by alleging the Non-Operators violated 52 O.S.1983 §§ 541–547 by not ratably sharing the gas sales. Gadsco defended by asserting that TXO was a contracted party with no rights to share in the gas revenues, and was therefore not protected by the statute.

On March 15, 1990, Gadsco and the Non-Operators moved for partial summary judgment on the breach of contract issue. The Non-Operators also asked the Court to enter summary judgment in their favor on the counterclaim asserted by TXO. In its response, TXO prayed for summary judgment in its favor on Gadsco's motion. The District Court granted TXO's request.

In the Journal Entry of Judgment filed on September 28, 1990, the District Court found the "Letter Agreement" dated June 29, 1983, was unambiguous and binding on the parties and that none of the other material facts were in dispute. The Court found as a matter of law that, pursuant to 52 O.S.1983 § 544, TXO was "not selling gas" and that the Non-Operators were obligated to pay TXO the entire amount of $1,369,532.00. The Court further found that because TXO preserved, in the Letter Agreement, all its rights under § 544, TXO was not obligated to repay the $1,369,532 to Gadsco. Because, the Court found that TXO was a non-selling party, the Court deemed it unnecessary to determine whether TXO was a party to a gas purchase contract in 1983, insofar as that fact pertained to TXO's rights under § 543. Judgment was granted to TXO on the Non-Operators' first and second causes of action and the Non-Operators appeal. Judgment was also granted to the Non-Operators on TXO's counterclaim, but that judgment was not appealed.

Prior to the enactment of H.B. 1221, an Operator could sell off all his proportional share of the gas without giving any of the non-contracting interest owners an option to sell their share. The non-contracting owner's proportionate share of the gas would remain in the ground until the Operator captured and reduced to possession all of his own share of the gas. Because the non-contracting owners did not have the ability to produce and market their share of the gas, the reservoir would often be depleted without any payment being made to those owners. The Legislature, being concerned that oil and gas well participants and mineral owners were being discriminated against in the sale of the production of their wells, formulated H.B. 1221. *Seal v. Corporation Commission,* 725 P.2d 278 (Okl.1986)

The Act sought to protect the rights and correlative rights of all interest owners and to afford all such owners an equal opportunity to extract their fair share of gas and to sell and be paid in proportion to their interest. 52 O.S.1983 § 541. "Correlative rights" are those rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common sources of supply. *United Petroleum Exploration v. Premier Resources,* 511 F.Supp. 127, 129 (W.D.1980)

All working and royalty interest owners are now entitled to share ratably in

the revenues from the sale of production. 52 O.S.1983 § 542(A). The Operator is required by law to notify each owner that the Operator will seek to market the owner's ratable share of gas production. 52 O.S. 1983 § 542(B). The owner has a choice to sell or not to sell his share of the gas. If an owner elects not to have the Operator market his share, then the Operator will not be so obligated. 52 O.S.1983 § 542(C). However, those owners who elect to sell, but who have no contract to sell, are entitled to share ratably in the revenues from the sales of each contract's production to the extent of their net revenue interest. 52 O.S.1983 § 543. Those parties electing not to sell are further provided for in § 544:

> On and after the effective date of this act, an owner of a well producing natural gas or casinghead gas may produce daily from the well that amount of gas which may be lawfully produced therefrom. *The amount of gas produced daily,* irrespective of the owner producing, belongs to, is owned by, and shall inure to the benefit of each owner in the well in proportion to each owner's interest in the well. Each owner who produces natural gas or casinghead gas and who separately sells or otherwise disposes of the gas must account to each other owner in the well *not selling* or *otherwise disposing of* gas from the well for that owner's part of the gas so disposed of or sold. In addition, each selling or disposing owner must compensate each owner *not selling* or *disposing of* gas from the well for that owner's proportionate part of the gas disposed of or sold. 52 O.S.1983 § 544.

In § 544, the "owner not selling" is the one who elected not to sell under § 542, but the non-seller's share does not remain in the ground as it did prior to the Act. He shares in the "amount of gas produced daily". It is notable that this § 544 protection does not extend to the non-selling owner who "otherwise disposes" of his proportional share. In the instant case, TXO qualifies as an owner who "otherwise disposed" of its share. By entering into the Gas Balancing Agreement executed June 29, 1983, TXO was not at the mercy of the Non–Operators, but was party to a bargained-for agreement. Not only is TXO an owner who "otherwise disposed" of its share, but it does not qualify as an "owner not selling" because it had the opportunity to sell to Delhi. TXO enjoyed the unique advantage of being able to delay the opportunity to sell to Delhi because of the pipeline's subsidiary status. TXO's choice not to sell to Delhi during the interim period did not abrogate its statutorily conferred rights because neither § 543 nor § 544 of the Act apply to an owner with a contract to sell its proportional share of the production. It is therefore irrelevant that TXO was not actually selling its gas to Delhi during the interim period because it had the *opportunity* to sell.

Unless all owners in a well have equal opportunity to sell gas from the well, they are not afforded the opportunity to produce their just and equitable share of the gas. The purpose of the Act is to afford this opportunity. *Seal v. Corporation Commission,* 725 P.2d 278, 287 (Okl.1986).

Considerable attention is denoted in the briefs to the non-waiver provision added to the agreement at the last minute by TXO. In that provision, TXO stipulated they were not waiving the benefit of H.B. 1221.

The non-waiver provision is not repugnant to the general intent of the parties, nor would its omission have abrogated any statutory rights of TXO. The Act does not prohibit oil and gas interest owners from entering into private gas balancing agreements. The *Seal* Court found nothing in the Act which expresses an intent to prevent such agreements. Section 542(D) states that the Act shall not be construed to interfere with contractual rights or to prevent an owner from taking its share of production in kind or separately disposing of its share. This includes an owner's right to enter into gas balancing agreements which provide for the disposition between interest owners. *Id.* Moreover,

such royalty owner's recovery is merely delayed. *Id.*

The District Court erred as a matter of law by entering summary judgment for TXO after finding the Letter Agreement was unambiguous and binding on the parties, and then finding that TXO was "not selling gas" pursuant to § 544. The District Court's finding that the Contract was unambiguous and binding and that no material facts existed is affirmed. The Court's finding that TXO was not selling gas is reversed. The grant of summary judgment is reversed with directions to enter summary judgment in favor of Gadsco and the Non–Operators on both its causes of action.

AFFIRMED IN PART, REVERSED IN PART WITH DIRECTIONS.

HANSEN, V.C.J., and HUNTER, J., concur.