Patrick A. DOHENY; Lucy Smith Battson, Inc.; E.L. Doheny, Inc.; William Henry Doheny, Inc.; Lucy Doheny Washington, Inc.; Timothy M. Doheny, Inc.; Sesnon Oil Company; Sevenwood, Inc.; Maurice W. Sullivan, Trustee of the Harry L. Crosby Marital Trust; Bank of the West, as Trustee for the Harry L. Crosby III Trust, and as Trustee for the Nathaniel Patrick Crosby Trust, and as Trustee for the Mary F. Crosby Lottimer Trust, Plaintiffs–Appellants,

v.

WEXPRO COMPANY; BHP Petroleum Company Inc.; Celsius Energy Company; Mountain Fuel Supply; Universal Resources Corporation, dba Questar Energy Company, Defendants–Appellees,

Rocky Mountain Oil and Gas Association, Amicus Curiae.

Nos. 91–8035, 91–8052.

United States Court of Appeals, Tenth Circuit.

Aug. 21, 1992.

---

Kenneth B. Siegel and Leanne B. De Vos of Sherman & Howard, Denver, Colo., for plaintiffs-appellants.

John F. Shepherd and Jane L. Montgomery of Holland & Hart, Denver, Colo., for defendants-appellees.

Charles L. Kaiser and Mary V. Laitos of Davis, Graham & Stubbs, Denver, Colo., filed an amicus curiae brief on behalf of Rocky Mountain Oil and Gas Ass'n.

Before LOGAN and EBEL, Circuit Judges, and SAFFELS,* Senior District Judge.

LOGAN, Circuit Judge.

In these appeals, plaintiffs-appellants seek review of an order of the district court granting summary judgment to defendants-appellees (referred to individually or as Mountain Fuel, et al.). The issues on appeal are whether plaintiffs are entitled to balancing in kind, rather than cash balancing, to equalize the current gas imbalance on wells subject to a unit operating agreement executed between the parties, the relationship between owners of the working interest, and the duties owed by the operator to the plaintiff working interest owners.[1] After carefully reviewing the record, as well as applicable law, we affirm.

## I

Plaintiffs are minority interest holders in certain oil and gas leases in Sweetwater,

---

* The Honorable Dale E. Saffels, Senior United States District Judge, United States District Court for the District of Kansas, sitting by designation.

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. See Fed. R.App.P.: 34(a); 10th Cir.R. 34.1.9. The cases are therefore ordered submitted without oral argument.

Wyoming, commonly referred to as the Trail Unit. Plaintiffs own an 8.2831% working interest in the leases. In 1958, plaintiffs entered into a unit operating agreement with Mountain Fuel, et al., to produce gas at the Trail Unit. Defendant Wexpro Company is the present operator of the gas wells. It does not have any ownership interest. Defendant Celsius Energy Company owns a 3.5529% interest, and defendants BHP Petroleum, Inc. and Mountain Fuel Supply Company own 46.-12099% and 42.04301%, respectively. Questar Pipeline Company is the owner of the only pipeline connected to the wells.[2] It is not a party to these appeals.

In 1987, plaintiffs entered into a gas purchase agreement with Questar Pipeline's predecessor, Mountain Fuel Resources. The agreement provided that the parties could renegotiate the purchase price for gas on an annual basis. The contract allowed for cancellation, upon appropriate notice, if the parties could not agree on a price. For the period from July 1, 1988, through June 30, 1989, the parties agreed to a price of $1.50 per MMBtu. The problems between the parties began when plaintiffs invoked the annual renegotiation clause in 1989.

On March 1, 1989, plaintiffs proposed a purchase price of $2.00 per MMBtu. Questar rejected that price, and, following further discussions, ultimately offered $1.40 per MMBtu. When the parties were unable to reach an agreement, the contract was terminated as of July 20, 1989. Questar then informed plaintiffs it would transport their gas, pursuant to federal regulations, if they found another purchaser. During 1989, BHP was being paid an average of $2.00 per MMBtu for its gas. Mobil Oil Company, the predecessor to Celsius, was paid $1.45 per MMBtu for the same period.

Wexpro shut down the wells during the summer of 1989. Beginning in October 1989, however, Wexpro resumed production for the Trail Unit interest owners other than plaintiffs because they had contracts to sell their gas. Wexpro kept detailed records of daily production attributable to each owner, including records concerning the extent to which plaintiffs were "underproduced." Because the other interest owners were selling all the available gas, they were "overproduced."

In December 1989, Wexpro delivered to plaintiffs a list of seven natural gas marketers in the Rocky Mountain region. Plaintiffs contacted two of the companies. One of those entities offered plaintiffs' agent a contract for $1.78 per MMBtu, but he declined, citing "excessive contract obligations." Appellees' App.Doc. E at 5. Plaintiffs consistently have maintained that it is not economically feasible to sell their gas to a third party because of the costs involved in transporting gas in Questar's pipeline.

Plaintiffs filed this lawsuit in June 1990, asserting they were entitled to cash balancing to cure the underproduction in the Trail Unit. Plaintiffs sought a declaratory judgment requiring the parties to balance production in cash until such time as a formal balancing agreement is executed. Plaintiffs also asserted claims based on unjust enrichment and conversion against the other working interest owners, and a claim for breach of fiduciary duties against Wexpro.[3] The district court granted summary judgment on all claims. On appeal, plaintiffs maintain that the court erred in (1) restricting their remedy to balancing in kind, rather than cash balancing, (2) concluding that the relationship between the interest owners is not a cotenancy, and (3) determining that Wexpro, as operator, does not have fiduciary duties that run to the plaintiffs.

We review the district court's summary judgment rulings de novo. *Kaiser–Fran-*

---

**2.** Wexpro, Mountain Fuel, and Celsius are affiliated corporations, all falling under the corporate umbrella of Questar Corporation. Questar Pipeline Company is another affiliate.

**3.** Plaintiffs have not appealed the district court's disposition with respect to their unjust enrichment, conversion, and punitive damages claims. Likewise, plaintiffs have not appealed the district court's denial of their motion to join Questar Pipeline Company as a party.

*cis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir.1989).

Summary judgment is appropriate when the materials submitted to the court 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' What facts are material depends on the substantive law being applied. Although we view the evidence in the light most favorable to the party opposing summary judgment, disputes about immaterial facts will not preclude summary judgment. Should a non-moving party make some showing on a material issue, we must consider the standard of proof ... and decide whether the showing is sufficient for a reasonable trier of fact to find for the non-moving party on that issue.... Moreover, should a non-moving party not make a sufficient showing on any essential element of his case, all other facts are rendered immaterial, and summary judgment is appropriate.

*Id.* (citations omitted). With these standards in mind, we review plaintiffs' claims.

## II

In these appeals we are asked to determine, in the absence of a formal gas balancing agreement, the proper remedy to correct a gas production imbalance. There is no dispute that the parties to this unit operating agreement must balance production. The dispute is over how balancing will be accomplished. Plaintiffs maintain the imbalance should be corrected through cash balancing, while Mountain Fuel, et al., contend that balancing in kind is appropriate. The district court determined, as a matter of law, that balancing in kind is the appropriate method. In plaintiffs' first claim on appeal, they maintain this conclusion was in error.

■ In kind balancing allows an underproduced party to take a designated percentage of the overproduced parties' gas until a balance is reached. *Beren v. Harper Oil Co.*, 546 P.2d 1356, 1359 (Okla.Ct.App.1975); *see also* Edel F. Blanks, III et al., *A Primer On Gas Bal-*ancing, 37 Loy.L.Rev. 831, 838 (1992) (discussing methods employed to balance production). Cash balancing, on the other hand, requires the overproduced party to compensate the underproduced party in cash to effectuate a balance. *See Kaiser–Francis Oil Co.*, 870 F.2d at 569. This cash payment is normally based on the price the overproduced party received for the gas. *Id.*

■ The district court held balancing in kind is the preferred method for gas balancing in the industry. Appellants' App. Doc. 19 at 10. The few cases to address this issue are in accord, as are the authors who have addressed the subject. *See, e.g., Pogo Producing Co. v. Shell Offshore, Inc.*, 898 F.2d 1064, 1067 (5th Cir.1990); *United Petroleum Exploration, Inc. v. Premier Resources, Ltd.*, 511 F.Supp. 127, 131 (W.D.Okla.1980); *Beren*, 546 P.2d at 1359; Patrick H. Martin, *The Gas Balancing Agreement: What, When, Why, And How*, 36 Rocky Mtn.Min.L.Inst. 13–1, 13–29 n. 59 (1990).

These authorities do not espouse requiring in kind balancing in every instance. Rather, they reflect prevailing sentiment to use in kind balancing unless the equities dictate otherwise. *See Pogo Producing*, 898 F.2d at 1067; *Beren*, 546 P.2d at 1360. Historically, equities requiring cash balancing have included well depletion, *Beren*, 546 P.2d at 1360, and an inability to receive delivery of the gas production in kind. *United Petroleum*, 511 F.Supp. at 131. It is undisputed that neither of these considerations is present in the instant case.

The issue here is not whether plaintiffs are able to sell their gas, but rather whether they can do so at a price they deem appropriate. An inability to market gas at a price that the underproduced party deems satisfactory is not an equity that dictates cash balancing. *See Pogo Producing*, 898 F.2d at 1067. Cash balancing, if universally and automatically applied, would force persons like plaintiffs to sell their gas at a price they might deem unacceptable. Cash balancing, as an after the fact option for interest owners like plaintiffs, would give them a speculative advantage, to take in

kind in a rising price market and to take the cash in a declining market. Thus, we agree with the district court that on the undisputed facts presented in this record, balancing in kind is the appropriate method to balance production.

### III

The district court's conclusion that the working interest owners of the Trail Unit do not have a cotenancy relationship is closely tied to its determination that balancing in kind is the appropriate vehicle for balancing production. Plaintiffs object to this conclusion, and maintain that regardless of the technical nature of the relationship between the parties, the district court erred in interpreting the unit operating agreement in a manner that rejects a joint ownership theory.

▪ Plaintiffs assert that language in the contracts creates joint ownership between and among the parties to the agreement. Specifically, they point to Article 6.1.B of the unit operating agreement, which allocates production in the Trail Unit according to the parties' respective acreage holdings. II Appellants' App. doc. 23 at 2 (unit operating agreement). Plaintiffs argue this "allocation-by-acreage" provision results in common ownership in gas production.

In Article 6.3, however, the unit operating agreement provides that "[e]ach [p]arty shall currently as produced take in kind or separately dispose of its share of [p]roduction." II Appellants' App. doc. 23 at 6. This provision militates against a common ownership theory. The district court reconciled the two provisions by holding that the allocation-by-acreage provision relates to overall production, rather than to the character of the interest created. The court ruled that the take in kind provision goes to the type of interest created.

Because the unit operating agreement is a contract, the usual rules of contract construction apply. In Wyoming,

[t]he determination of the parties' intent is [the] prime focus in construing or interpreting a contract. "If an agreement is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the agreement." When the language is clear and unambiguous, the writing as a whole should be considered, taking into account relationships between various parts. Contract construction and interpretation are done by the court as a matter of law. *Woods Petroleum Corp. v. Hummel,* 784 P.2d 242, 243 (Wyo.1989) (citations omitted). The unit operating agreement is not ambiguous. When read as a whole, including all its component provisions, the agreement is clear. *See Farr v. Link,* 746 P.2d 431, 433 (Wyo.1987) (An ambiguous contract is "obscure in its meaning because of indefiniteness of expression or because of a double meaning being present."). The construction that the district court placed on the particular articles at issue is consistent with the plain meaning of the remaining contract terms. In particular, the district court's construction comports with Article 28, which explicitly provides that the agreement does not create a partnership. Appellants' App. doc. 23 at 15 (unit operating agreement). Article 28 also provides that the liabilities of the parties "shall be several and not joint or collective." *Id.* Read together, these contract provisions support a conclusion that the working interest owners are not cotenants in these leases.

### IV

▪ Finally, plaintiffs argue that the district court erred in granting summary judgment on claims it made against Wexpro, the operator of the Trail Unit. Plaintiffs' argument is two-fold. First, they maintain it was error to rule that Wexpro owed no fiduciary duty to the plaintiffs. Second, they contend the district court erred in failing to imply a duty of good faith and fair dealing in the unit operating agreement.[4]

---

**4.** Mountain Fuel, et al., contend that plaintiffs did not raise this issue in the district court and therefore are barred from asserting it here.

*Dime Box Petroleum Corp. v. Louisiana Land & Exploration Co.,* 938 F.2d 1144, 1148 (10th Cir. 1991). We hold plaintiffs' arguments in the

The parties' contract answers the dispositive question whether, and if so, to what extent, Wexpro owes a fiduciary duty to plaintiffs. *Andrau v. Michigan Wis. Pipe Line Co.*, 712 P.2d 372, 374–75 (Wyo.1986). In the district court, plaintiffs maintained that Wexpro's alleged fiduciary duty obligated it to shut down the wells and obtain a formal balancing agreement once plaintiffs' gas purchase agreement was terminated. Appellants' App. doc. 9 at 19. These are not duties outlined in the contract, nor are they duties that would naturally arise as corollaries to the obligations set forth in the agreement. *See Dime Box Petroleum Corp.*, 938 F.2d at 1148 (district court did not err in "concluding the parties contracted for a standard to measure operator's conduct which is different than that applicable to a fiduciary").

The cases that plaintiffs cite in support of their argument are distinguishable and do not support plaintiffs' contention that Wexpro owed duties above and beyond those outlined in the parties' express agreement. *See Reserve Oil, Inc. v. Dixon*, 711 F.2d 951, 953 (10th Cir.1983) ("contract created a trustee type relationship"); *Britton v. Green*, 325 F.2d 377, 383 (10th Cir.1963) ("the operating contract had the effect of constituting [the defendant] the ... trustee for all the co-tenants"); *Young v. West Edmond Hunton Lime Unit*, 275 P.2d 304, 309–10 (Okla.1954) (when statute required operator to account to owners, failure to advise owners of price increase was a breach of duty), *appeal dismissed*, 349 U.S. 909, 75 S.Ct. 600, 99 L.Ed. 1245 (1955).

Because plaintiffs made no showing that Wexpro breached a specific duty encompassed by the operating agreement, they also failed to raise a question of fact concerning breach of an implied covenant of good faith and fair dealing. *See Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1519 (10th Cir.1991) (absent breach of operating agreement, no breach of implied duty of good faith). "In Wyoming, a party does not breach a covenant of good faith and fair dealing by exercising its contractual rights." *Insurance Co. of N. Am. v. Bath*,

726 F.Supp. 1247, 1255 (D.Wyo.1989). The district court did not err in granting summary judgment on these claims.

AFFIRMED.

district court encompassed this issue. Therefore, it is raised appropriately on appeal.