**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 24 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

QUESTAR PIPELINE COMPANY,

      Plaintiff - Counter - Defendant - Appellee,

vs.

JACK J. GRYNBERG; CELESTE C. GRYNBERG; L & R EXPLORATION VENTURE,

      Defendants - Counter - Claimants - Appellants.

Nos. 98-8054 and 98-8092

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 92-CV-265)**

---

John F. Shepherd (Jane L. Montgomery and Donald I. Schultz, Holland & Hart, and Terrie T. McIntosh, Questar Corporation, with him on the brief), for the Plaintiff-Counter-Defendant- Appellee.

Tom C. Toner, Yonkee & Toner, Sheridan, Wyoming, for Defendants-Counter-Claimants-Appellants.

---

Before **TACHA**, **KELLY**, and **LUCERO**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

This case arises from disputes concerning several natural gas sales

contracts. Appellee Questar Pipeline Company ("Questar") purchased natural gas from appellants Jack J. Grynberg, Celeste C. Grynberg, and L&R Exploration Venture ("Grynberg"). The gas purchase agreements at issue in this case were entered into in 1974, when gas prices were still regulated. Because the parties disagreed on the interpretation of the contract provision governing how to determine the price after deregulation, Questar brought a declaratory judgment action in 1992. Grynberg counterclaimed, charging that Questar: (1) did not take the amount of gas it was obligated to under several take-or-pay contracts; (2) breached the gas purchase agreements and an earlier settlement agreement; (3) intentionally interfered with the contractual relationship between Grynberg and the unit operator; (4) breached its duty of good faith and fair dealing by refusing to agree to decontrol certain wells upon Grynberg's request; (5) provided incorrect information to the unit operator concerning Grynberg's working interest, resulting in an underpayment; and (6) intentionally took gas without paying for it by placing devices on wells that allowed gas to flow around meters.

The district court granted summary judgment for Questar on the stolen gas issue (counterclaim 6). The deregulation price issue and the remaining counterclaims were then tried. The jury returned a verdict for Grynberg on all of its claims. Questar then sought judgment as a matter of law (formerly J.N.O.V.) under Fed. R. Civ. P. 50(b). The court greatly reduced the jury's determination of

the price to be paid after deregulation and the amount to be paid under the take-or-pay contracts, and granted judgment for Questar on all of the counterclaims. Grynberg appeals the grants of judgment as a matter of law as well as the summary judgment on the stolen gas claim.

We reverse the district court's determination on the deregulation price issue, the take-or-pay contracts (counterclaim 1), and the breach of contract and intentional interference with contract claims (counterclaims 2 & 3). We affirm its ruling on the duty to decontrol (counterclaim 4), the working interest claim (counterclaim 5), and the stolen gas claim (counterclaim 6).

A. Take-or-Pay Contracts

    1. <u>Contract 246</u>

Proper damages for Grynberg's take-or-pay claims under contract 246 for the years 1988 and 1990 are still in dispute. The jury awarded Grynberg $163,883.56 for 1988 and $124,976.83 for 1990. The district court denied Questar's motion for judgment as a matter of law on these claims, but several years later reduced the damage awards to $15,812.44 and $28,337.10 respectively. This was an abuse of discretion.

The court entered judgment on the reduced damage amounts, characterizing the evidence on damages as "undisputed." In fact, evidence had

been admitted--a Grynberg exhibit calculating damages in exactly the amount the jury ultimately awarded. This exhibit was part of the record, and the jury had the right to rely on it in reaching its verdict. While some conflicting evidence supported the court's finding of lower damages, the evidence was far from "undisputed," and the jury's verdict should not be disturbed.

The controversy centers on the proper way to calculate the volume of gas Questar was obligated to take from Grynberg in various years under the take-or-pay contracts. The initial amount Questar was obligated to take was determined by a yearly test of the production capacity of all of the wells in the contract area. In some cases, wells could not be tested during the test period due to temporary mechanical problems. In other cases, new wells were brought on line after the date of the tests. In a pre-trial order, the court ruled that Grynberg could not increase Questar's take obligation by counting the additional production from any new wells added after the test period, unless Grynberg specifically requested a retest.

Abiding by the pre-trial order, Grynberg did not consider the production from any new wells when increasing Questar's obligation over the amount indicated by the initial tests. Rather, he attempted to increase the obligation by counting the increased capacity generated by the addition of compressors to existing wells that had been unable to produce during the initial testing period.

Grynberg argued that this was allowed by Paragraph V-2(c) of its gas purchase agreement with Questar which provided "Should any well or wells be unable to be produced during the test period for temporary reasons such as mechanical failure or reworks, the test results shall be adjusted accordingly." Aplt. App. at 6238.

Questar contended, and the court agreed, that this method of calculation violated its pre-trial order. The court therefore reduced the jury's damage award (which took into account the increased production capability generated by adding compressors to existing wells) and entered judgment in an amount that disregarded any compressor-enhanced obligations.

Grynberg introduced into evidence several different calculations of take-or-pay damages. One of these was Exhibit G-490, which contained the amounts the jury ultimately awarded. A footnote to this exhibit contained the words "Deliverability not changed due to compressor installation." In fact, the numbers in the exhibit did include changes in deliverability due to compressor installation. Because Questar believed the footnote to be accurate, it did not object when the exhibit was offered. The general rule is that a party may not protest the jury's use of an exhibit to which that party did not object when offered into evidence. See United States v. Ivy, 83 F.3d 1266, 1287 (10th Cir. 1996). In this case, however, the inaccurate statement in the exhibit was not apparent on the exhibit's

face and the basis of the objection -- that the damage calculations were inconsistent with the footnote, only became apparent on cross-examination. Thus, Questar's right to later contest the jury's use of the exhibit was not waived by its failure to object when the exhibit was first offered.

However, after admission of the exhibit, Questar was able to elicit on cross-examination that some of the figures in the exhibit included increases due to compressor installation. Grynberg's witness admitted that these figures were inconsistent with the exhibit's footnote, admitted that increasing damage amounts to reflect the addition of compressors appeared to be a mistake in the analysis, and agreed that taking out the compressor-increased amounts would result in a reduced claim for damages from what was included in the exhibit. Aplt. App. at 4231-33. Questar never moved to strike the exhibit. Nor did it move for judgment as a matter of law at the close of evidence that Exhibit G-490 displayed a legally inaccurate calculation of damages. The damage figures in the exhibit remained in the record for the jury to consider.

Questar argues that it did not need to object to the exhibit or make a Rule 50 motion because it had obtained partial summary judgment on the issue. The district court agreed, finding that any damages claimed as a result of adding compressors were in violation of its pre-trial order. But the pre-trial order only concerned the need to subject new wells to a retest; it did not address the issue of

how Questar's obligations would be affected by the addition of a compressor to an existing well that had been temporarily shut in due to mechanical problems during the initial testing period.  Far from being an "inexorable extension" of the order, as Questar claimed, this issue remained open after the pre-trial order.

Additionally, our review of the transcript does not support a characterization of the evidence as "undisputed."  After discovering on cross-examination that the damage figures in Exhibit G-490 were enhanced by compressor installation, Questar called another Grynberg employee as an adverse witness.  This witness's purpose was to present damage figures reflecting the elimination of compressor-enhanced delivery obligations.  The reduced figures presented by this witness were those the court ultimately awarded to Grynberg.  The witness did say that he believed his initial (larger) calculations may have been in error to the extent they included compressor-enhanced obligations.  Aplt. App. at 5715.  Had this been the end of the testimony, the court may have been correct in characterizing the evidence as "undisputed."  However, the witness went on to say that the lower damage figures were only an alternative scenario, not the "correct" scenario; that Grynberg was not changing its initial position, and that Grynberg was still asking for the full amount listed in Exhibit G-490.  Id. at 5733-36.  In fact, this witness testified that, in his opinion, the new, lower figures should not be used by the jury.        Id. at 5735.

Questar argues that a court may reduce damages "in those cases in which it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there." 11 Charles Alan Wright et al., Federal Practice and Procedure § 2815 (2d ed. 1995). This is not such a case. The jury's award was within the range of proof and was supported by evidence that Questar never moved to strike. Grynberg's method of calculating damages did not violate the court's pre-trial order. The jury's award was not so excessive as to shock our conscience, nor did it "raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1168 (10th Cir. 1983). We therefore remand to the district court to enter judgment on this claim consistent with the jury's verdict.

2. Contract 245

The jury awarded Grynberg $45,385.09 on Contract 245 for the year 1988. Due to either simple oversight or a clerical error, this amount was omitted from the final judgment. Questar consents to modification of the judgment to correct this error. We remand to the district court to modify the judgment accordingly.

B. Breach of Contract; Intentional Interference with Contract; Punitive Damages

Questar and Grynberg settled prior litigation in December 1988. Under the

terms of the settlement agreement, Questar made a $1.7 million prepayment to Grynberg. The agreement provided that Questar had up to five years after the date of prepayment to "make up the gas in the manner provided for in the applicable gas purchase contracts." Aplt. App. at 6320. In other words, once Questar had taken the minimum amount of gas it was obligated to take from Grynberg in a given year under existing take-or-pay contracts, any additional gas taken from Grynberg in that year would be credited toward making up the prepaid amount under the settlement agreement. Thus, the lower the price of gas at the time Questar was making up its gas, the greater the volume Questar could take before reaching its prepaid $1.7 million total.

The parties do not dispute that Questar had the right to make up the prepayment. Rather, the dispute centers on how that right could be exercised. Once it had taken its minimum requirements from all of the owners in the Nitchie Gulch Unit for 1989, Questar attributed all further production in the unit for that year as having come from Grynberg's interest, even though Grynberg only had a 32% working interest share in the unit. In doing so, Questar made up its prepayment much more quickly than it could have done without allocating 100% of unit production to Grynberg.

Grynberg contends that Questar was only permitted to make up the payment out of its 32% working interest share, and that Questar had no right

under existing contracts to force Grynberg to produce in a non-ratable fashion. Grynberg further contends that the only way Questar could accomplish the result it did was by improperly inducing a third party, Terra Resources ("Terra"), [1] to breach its agreement with Grynberg by agreeing to non-ratable production.

By being forced to take more than its share of the gas produced in the unit, Grynberg became "overproduced" vis-a-vis the other interest owners and was required to pay back the excess gas in the future. At the time it had to give back the gas to the other interest owners, gas was more valuable than it had been at the time it was forced into overproduction by Questar.

The jury found for Grynberg on all three of its claims: (1) that Questar breached its contract in the manner it made up the gas in 1989; (2) that Questar intentionally interfered with Grynberg's contract with Terra; and (3) that Questar should pay punitive damages for its willful and wanton actions in connection with the intentional interference claim. It awarded Grynberg $381,764.83 on the breach of contract claim, $338,585.76 on the intentional interference claim, and $200,000 in punitive damages.

The district court set aside the jury's verdict more than four years after the trial, and granted Questar judgment as a matter of law on these issues. Four

---

[1] Shortly after signing the agreement with Questar, Terra became known as Pacific Enterprises Oil Company. The company will be referred to as "Terra" throughout the opinion to avoid confusion.

years appears to be an inordinate amount of time. While we appreciate the busy caseload of a district court, fundamental fairness to the parties and the integrity of the judicial system require disposition of post-trial motions in a far more expeditious manner.

We review a district court's ruling on a motion for judgment as a matter of law de novo. See Greene v. Safeway Stores Inc., 98 F.3d 554, 557 (10th Cir. 1996). Judgment as a matter of law is appropriate "'only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'" Vining v. Enterprise Fin. Group, Inc., 148 F.3d 1206, 1213 (10th Cir.1998) (citation omitted). In reviewing, "we may not weigh the evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury." Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1522 (10th Cir.1997). We find that the district court erred when it set aside the jury's verdict on these claims.

Under Wyoming law, a claim of intentional interference with contract requires proof of "(1) the existence of a valid contractual relationship; (2) knowledge of the contractual relationship on the part of the Defendant; and (3) intentional and improper interference by the [defendant] inducing or otherwise causing a breach of the relationship; (4) which resulted in damage to the Plaintiffs." First Wyoming Bank v. Mudge, 748 P.2d 713, 716 (Wyo. 1988).

In order to induce Terra, which was a working interest owner as well as the unit operator, not to take or dispose of its entire share of gas production, Questar secretly offered to build gathering lines to connect wells owned by Terra outside the unit to the main gas transmission line. These lines would allow Terra to sell gas it could not otherwise have produced. Questar and Terra finalized their arrangement in a confidential agreement in which Terra agreed to reduce its take non-ratably. Aplt. App. at 10570-75.

Questar admitted at trial that it would never have been able to make up all of its prepaid gas within the allotted period without the side agreement with Terra. Aplt. App. at 4923. The relationship between the operator and the working interest owners, including how the gas is to be allocated, is governed by the Unit Agreement and the Unit Operating Agreement, two contracts to which Questar was not a party. Questar argued, and the court agreed, that the Unit Operating Agreement permitted non-ratable production, so that convincing Terra to forego production could not be considered an improper interference with the contracts.

Grynberg argues that ratable production is mandatory, and is compelled by Section 6.3 of the Unit Operating Agreement, which provides that "Each Party shall currently as produced take in kind or separately dispose of its share of Production and pay Unit Operator for any extra expenditure necessitated

thereby." Aplt. App. at 10591.  Grynberg contends, and no evidence was adduced at trial to show otherwise, that because of this mandatory provision, no owner had ever failed to take its entire share of gas during the 20 year history of the Nitchie Gulch Unit except for the time Questar interfered with the contract.

The court based its conclusion that non-ratable production was permitted by the contract primarily on Section 6.4 of the Unit Operating Agreement, which permits the operator to sell gas on a limited basis if a working interest owner fails to take or separately dispose of its share of production.  Id.  The court also relied heavily on Doheny v. Wexpro Co., 974 F.2d 130 (10th Cir. 1992), which prescribed in-kind balancing of the type employed in this case as a remedy for one party's underproduction.  In so finding, the court misconstrued both the Unit Operating Agreement and Doheny.

The court's reading of Section 6.4 would turn Section 6.3's requirement that each owner take its full share of production into a mere option to take.  This would contradict the contract language, as well as industry custom.  If an owner were allowed to choose to underproduce when it could have a market for gas, thereby putting other owners into a position of overproduction, an environment for speculation would be created.  The underproducing owner could either sell his withheld gas for a higher price at a later date, or, if the higher price never materializes, demand monetary compensation from the overproducing party.  See

- 13 -

Patrick H. Martin, The Gas Balancing Agreement: What, When, Why, and How, 36 Rocky Mtn. Min. L. Inst. 13-1, 13-8 (1990). Questar's senior attorney, an expert on industry practice, admitted that industry custom dictates that as long as an owner has a market for its gas it should not be allowed to make the strategic decision not to sell its gas and to make someone else take more than their share. Aplt. App. at 5010. In this context, the purpose of Section 6.3 is clear, and the Unit Operating Agreement must be read to prohibit voluntary non-ratable production.

The better reading of Section 6.4 and Doheny is to view them as addressing what to do in the event of underproduction, rather than whether voluntary underproduction is permitted. By providing a remedy for underproduction the Unit Operating Agreement is not authorizing it, but merely supplying a contractual response in case of a breach. Additionally, not all underproduction is the result of a breach; sometimes it is involuntary. For instance, in Doheny, the plaintiff was underproduced because it did not have a contract to sell gas, while other working interest owners did have contracts. When those with contracts met their obligations, the plaintiff became underproduced. The suit was to determine whether the proper way to achieve balance within the unit was to give plaintiff cash or gas. Doheny, 974 F.2d at 132-33. In the instant case, by contrast, the issue is whether the imbalance was

- 14 -

caused by a breach of contract, not what the proper remedy should be for the imbalance situation. Thus, <u>Doheny</u> is distinguishable, and Section 6.4 can be read in harmony with the mandatory take provisions of Section 6.3.

Questar also argues that, under Article 8 of the Unit Agreement, Grynberg delegated to Terra, the operator, the power to allocate production among the various interest owners. Thus, Questar argues, Terra's allocation of 100% of unit production to Grynberg was not a breach of contract, and therefore Questar's actions cannot be considered improper. This argument fails for two reasons. First, Questar's reading of Article 8 ignores other relevant sections of the Unit Agreement. Second, even if Terra did have the authority to allocate 100% percent of the unit's production to Grynberg, it was Questar, not Terra, who manipulated this allocation.

Article 8 says, in relevant part:

Except as otherwise specifically provided herein, the exclusive right, privilege, and duty of exercising any and all rights of the parties hereto which are necessary or convenient for prospecting for, producing, storing, allocating, and distributing the unitized substances are hereby delegated to and shall be exercised by the Unit Operator as herein provided.

Aplt. App. at 11979

Questar argues that the power of "allocating" granted to the Unit Operator gives Terra the right to consider Grynberg the producer of 100% of the gas in the unit. But Article 8 says <u>except as otherwise specifically provided herein</u>, and

- 15 -

Questar's reading ignores specific limitations on this power found elsewhere in the Unit Agreement and the Unit Operating Agreement. Article 7 specifically declares that the Unit Operating Agreement "shall also provide the manner in which the working interest owners shall be entitled to receive their respective proportionate and allocated share of the benefits . . . ." Id. The Unit Operating Agreement provides this manner of allocation in Section 6.3, requiring each owner to take proportionately, rather than subjecting allocation to the operator's whims.

Additionally, Article 12 of the Unit Agreement once again reiterates that all gas produced in the unit shall be allocated "on the basis prescribed in the unit operating agreement . . . ." Aplt. App. at 11983. Once again, this is clear evidence that Grynberg did not give up its right to a ratable allotment when it signed the Unit Agreement.

Quite simply, under the circumstances, Grynberg could not be forced to sell any more than its 32% interest in the unit's production. Even Questar's own expert witness admitted that if Terra did not take its share of production, industry standard and practice dictated that Grynberg had the right, but not the obligation, to take that additional share. Aplt. App. at 5004.

Notwithstanding the fact that Terra did not have the power to allocate 100% of the production to Grynberg, Questar's claim that Terra made such an

allocation is also belied by the evidence. In fact it was Questar, not Terra, that treated 100% of the unit's production as having come from Grynberg. When Questar told Terra that it was allocating 100% of production to Grynberg, Terra protested that Questar's actions were "without basis or justification," and expressed concerns that Questar's actions "may run afoul of pre-existing rights and obligations" of working interest owners based on operating agreements and unit agreements. Aplt. App. at 10579-81. Clearly, Terra was not making the allocation, and Questar did not have the right to make it either.

Though it did not provide the essential basis for the court's decision to set aside the jury verdict, the court also found that Questar's affirmative defense of estoppel was supported by the evidence. The jury was instructed on all of the elements of this defense, and specifically found in a special verdict that Questar had failed to establish it. Numerous contradictions existed in the testimony as to both Grynberg's knowledge of Questar's activities, and whether Questar detrimentally relied on Grynberg's lack of protest. In light of the special jury verdict, and the evidence supporting it, the court's finding that Grynberg should be estopped from contesting Questar's actions is error.

Questar argues that the jury's award of $338,585.76 on the intentional interference with contract claim is duplicative of its award of $381,764.83 on the breach of contract claim. This argument fails for two reasons. First, the jury was

explicitly instructed both by the court and on the special verdict form that it could not duplicate damages. Aplt. App. at 1520, 1585. Juries are presumed to follow the court's instructions. See Townsend v. Daniel, Mann, Johnson, & Mendenhall, 196 F.3d 1140, 1150 (10th Cir. 1999). Absent further showing, we find no reason to conclude that the jury disobeyed its instructions. Second, the total of the two amounts awarded was actually less than the amount ($763,268.66) claimed by Grynberg as damages resulting from the way the gas prepayment was made up, and was supported by exhibits. Aplt. App. at 4185-93, 10728-39. Because the award is within a range of the evidence, we will not disturb it.

Finally, we reinstate the jury's award of punitive damages. The district court overturned this award based on its findings that Questar had the right to act as it did in making up the gas, and that Terra had the right to choose to take non-ratably, meaning that there was no evidence that Questar acted inappropriately. The court can set aside a jury's punitive damage award only if no reasonable jury could have found on the record as a whole that Questar acted willfully and wantonly. See Patton v. TIC United Corp., 77 F.3d 1235, 1245 (10th Cir. 1996). Because we conclude that the evidence supports the finding that Questar did, in fact, wilfully breach its agreement with Grynberg and induce Terra to breach its agreement as well, we hold that the jury had sufficient grounds to award punitive damages.

C. Price

Another issue in this case is the price Questar was obligated to pay Grynberg for gas it purchased once gas prices were deregulated by the government. The method of calculating the price was governed by the Gas Purchase Agreements between Questar and Grynberg. The agreements provided for two methods of determining a price in the event of deregulation. The price would be the higher of 1) "the price provided in this contract"; or 2) "the average price of the two highest prices under contracts . . . whose terms are for three years or longer adjusted to like quality and comparable terms and conditions as established by contracts made subsequent to the above mentioned legal change . . . ." Paragraph VI-3, Aplt. App. at 6240.

Before trial, the district court made several rulings interpreting the language of these agreements. On two of these rulings, the court granted Questar's motions for summary judgment on the contested interpretations. First, the court ruled that the meaning of the phrase "the price provided in this contract" in Paragraph VI-3 of the agreements was unambiguous, and referred to a specific base price subject to adjustment, as opposed to Grynberg's contention that it could refer to the last regulated price for gas prior to deregulation. Attachment to Aplt. Br. at 56-57. Next, the court ruled that the phrase "contracts made subsequent to the above mentioned legal change" referred to contracts that

took effect or were entered into after deregulation occurred, as opposed to Grynberg's interpretation that it referred to contracts entered into after Congress passed the Decontrol Act, but before deregulation actually occurred.  Id. at 57-58.[2]

Despite these two rulings, which narrowed the issues and evidence to be considered at trial, conflicts remained over whether "the price provided in this contract" was higher than the average of the two highest prices under comparable contracts, and which contracts could appropriately be considered "comparable."

Article VI-1(b), integral in defining "the price provided in this contract," stated that prices "shall be adjusted to reflect the effective date and price as set out in an order in the forthcoming proceedings in FPC [Federal Power Commission] Docket No. R-389B." Aplt. App. at 6239. Docket R-389B consisted of several opinions, the final one of which was called 699-H. This opinion provided for a base price of $.50 per mcf, with annual escalations of $.01 per mcf. If "the price provided in this contract" were limited to the opinions issued under Docket R-389B, as Questar argued it should be, this would result in a final price lower than the qualifying contract prices, requiring the price to be

_____

[2] Because of our reinstatement of the jury verdict, Grynberg is no longer pursuing its claims that the court erred in granting summary judgment for Questar on these contract interpretation issues.  Thus, we need not address whether the court's interpretations were correct.

determined by adjusting qualifying contracts for comparable terms and conditions under Article VI-3.

Grynberg argued, however, that because Docket R-389B contained language mandating a review of prices every two years, pricing revisions issued as part of future dockets should be considered part of the contract as well. Before trial, the district court found that there was an issue of material fact as to how the language referring to Docket R-389B should be interpreted, and denied Questar's motion for summary judgment on that issue. The court allowed expert testimony on the issue.

Grynberg's primary expert on this issue was Nancy Skancke, an experienced consultant on energy regulation and pricing issues. Ms. Skancke testified that the pricing provision should be read to include opinions issued in future dockets, as well as the Natural Gas Policy Act of 1978. She testified that, if the contract were so interpreted, the prices Grynberg should be paid under the contract would be $3.076 per MMBTU for wells that deregulated on May 15, 1991, and $3.217 per MMBTU for wells that deregulated on January 1, 1993. These are precisely the prices the jury awarded to Grynberg.

After the jury returned its verdict, the district court concluded it had erred in not granting summary judgment on this interpretation issue in favor of Questar. It declared that the contract language referring to Docket R-389B was

unambiguous as a matter of law, and that Ms. Skancke's testimony was extrinsic evidence that contradicted the plain language of Paragraph VI-1(b) and should not have been allowed. It thus ordered her testimony as it related to that issue to be stricken. Grynberg argues that the trial court erred in finding the language unambiguous. In making this argument, Grynberg relies heavily on City of Farmington v. Amoco Gas Co., 777 F.2d 554 (10th Cir. 1985), which found a price redetermination clause to be ambiguous in light of changed regulatory circumstances, and interpreted the clause to include future dockets and even the National Gas Policy Act.

We agree with the district court's finding that the language of Paragraph VI-1(b) is unambiguous. Farmington does not persuade us otherwise. The clause at issue in Farmington did not specify any particular docket number which was to be binding. 777 F.2d at 557. In contrast, the contract at issue in this case manifestly limits pricing considerations to Docket R-389B. The parties were free to put in a provision to incorporate future proceedings, but did not do so. Ms. Skancke's testimony was extrinsic evidence contradicting the plain language of the contract and was properly stricken.

However, this does not end the matter. The jury's award was within the range of evidence presented by Mr. Grynberg's testimony, which calculated the proper price as lying somewhere between $2.81 and $4.12 for wells that

- 22 -

deregulated in 1991, and between $2.80 and $4.97 for wells deregulating in 1993. Because the award was within the range of evidence, judgment as a matter of law or a new trial is not appropriate even though the amount awarded was the same as that presented in the stricken testimony. See Midwest Underground Storage, Inc. v. Porter, 717 F.2d 493, 500-01 (10th Cir. 1983) (upholding jury's verdict for a winning claim that was, to the penny, an identical amount claimed as damages for a different claim on which plaintiff lost). To do so would be to impermissibly speculate as to the manner by which jurors arrived at the verdict. See Howard D. Jury, Inc. v. R & G Sloane Mfg. Co., 666 F.2d 1348, 1352 (10th Cir. 1981).

The district court acknowledged that the verdict was within the range of evidence presented to the jury, but held that the jury should not have been allowed to consider Mr. Grynberg's testimony concerning how to calculate prices using the method of adjusting qualifying contracts for comparable terms and conditions under Article VI-3. The district court ruled post-trial that Mr. Grynberg's testimony was based on an improper methodology and not supported by a sufficient foundation. This was an abuse of the court's discretion, because Questar failed to make a timely objection to this evidence at trial.

At trial, Questar did not object to Mr. Grynberg's testimony during direct examination. In fact, when Grynberg sought to introduce an exhibit showing Mr.

Grynberg's conclusions on the price range and his methodology in arriving at those figures , Questar stated "No objection." Aplt. App. at 4456. It was only after Mr. Grynberg's direct examination that Questar objected to his testimony. The court overruled the objection on the grounds that it was untimely. Questar had a copy of the exhibit, showing Mr. Grynberg's methodology, before trial. In addition, it had deposed Mr. Grynberg on the matter extensively. It cannot now claim that it had to hear all of Mr. Grynberg's testimony before knowing whether it had grounds to object. By not making a timely objection, and even affirmatively stating that it had no objection to Mr. Grynberg's primary exhibit, Questar waived its right to later challenge this evidence.

Finally, by reversing its ruling made during trial that Questar's objection to Grynberg's testimony was untimely, the court unfairly prejudiced Grynberg, which had no way of knowing that it should offer additional evidence or try to prove the issue in a different manner. See Vallegos v. C.E. Glass Co. , 583 F.2d 507, 511-12 (10th Cir. 1978).

Questar now argues that the timeliness of its objection is irrelevant in part because it would be plain error to admit Mr. Grynberg's testimony. In civil cases, the plain error exception is limited to errors that significantly affect "the fairness, integrity or public reputation of judicial proceedings." Polys v. Trans-Colorado Airlines, Inc. , 941 F.2d 1404, 1408 (10th Cir. 1991) (citation and

internal quotes omitted).  We find that admission of Mr. Grynberg's testimony does not meet this high standard.

Questar also argues that the court's role as "gatekeeper" concerning scientific opinion evidence is ongoing throughout the proceedings, allowing the court to strike evidence at any time, even without an objection ever having been lodged.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Daubert does note that, even after evidence is initially admitted, "in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment . . . ."  509 U.S. at 596.  However, we do not read this as overriding the general requirement of a timely objection to the evidence.  A party may waive the right to object to evidence on Kumho/Daubert grounds by failing to make its objection in a timely manner.

Questar supports its argument that the trial court may strike expert testimony even in the absence of an objection by citing Hoult v. Hoult, 57 F.3d 1, 4 (1st Cir. 1995).  In Hoult, the defense did not object to the plaintiff's medical testimony before or during trial.  However, the trial court did not strike the testimony, but accepted it.  The First Circuit found that "Daubert does instruct

district courts to conduct a preliminary assessment of the reliability of expert testimony, even in the absence of an objection." Id. It went on to say that district courts were not required, sua sponte, to make specific on-the-record rulings concerning the admissibility of expert testimony. Id at 4-5. We agree with this principle, but it does not aid Questar in these circumstances. The Hoult court spoke of a "preliminary assessment," which the district court made in this case. Nothing in the language of Hoult suggests the ability of a court to strike testimony after trial that it has otherwise deemed admissible during trial, in the absence of an objection.

Further, Questar has not pointed us to any material indicating that Mr. Grynberg was actually testifying as an expert on the issue of prices. If Mr. Grynberg was not testifying as an expert witness on this subject, Daubert does not apply. In fact, just before overruling Questar's objection to Mr. Grynberg's testimony as untimely, the court indicated it was inclined to instruct the jury that Mr. Grynberg "is not an expert in this area but is entitled to state his opinion as to how he values his gas." Aplt. App. at 4475.

Because we find Mr. Grynberg's testimony was improperly stricken, and because the testimony's inclusion puts the jury's award within the range of evidence, the jury's award of $3.076 per MMBTU for wells that deregulated on May 15, 1991, and $3.217 per MMBTU for wells that deregulated on January 1,

1993 should be reinstated.

D.  Duty to Decontrol

In 1989, Congress enacted the Natural Gas Wellhead Decontrol Act, which scheduled certain wells for deregulation on May 15, 1991, and others on January 1, 1993.  Under the Act, parties to existing gas purchase contracts were permitted to voluntarily agree to deregulate the price of gas covered by those contracts prior to the effective dates of deregulation.  In order to put such an agreement into effect, the parties could simply execute a document after March 23, 1989, agreeing that the gas sold from the existing well would no longer be subject to the maximum price ceilings.

Grynberg claims it requested that Questar agree to deregulate a number of wells before the 1991 and 1993 effective dates of deregulation.  Grynberg argues that Questar had a duty to agree to decontrol the prices, relying on the following language in Article VI of the gas purchase agreements:

> NOTWITHSTANDING anything herein to the contrary, it is agreed that if the Federal Power Commission, or any successor governmental authority having jurisdiction in the premises, shall prescribe or approve a price or prices, however determined, applicable to the gas being sold hereunder which . . . is higher than the price otherwise applicable hereunder, then the price for gas sold hereunder shall be increased to equal such higher price effective upon the effective date prescribed by such governmental authority.

Aplt. App. at 6239.

Grynberg's claim is that the Act "approve[d] a price . . . higher than the price otherwise applicable hereunder" and that Questar was obligated to agree to

- 28 -

decontrol the wells, if requested, in order to comply with its duty of good faith and fair dealing. Questar contends that the NOTWITHSTANDING clause does not compel Questar to agree to decontrol simply at Grynberg's request. Prior to trial, the court denied Questar's motion for summary judgment on the issue, finding that the issue of whether or not Questar acted in good faith was a fact question.

The jury found that Questar acted in bad faith in refusing to decontrol the wells upon Grynberg's request. However, in ruling on Questar's post-trial motion for judgment as a matter of law, the court found that the contract provided no duty to decontrol. This was a contractual interpretation issue and a question of law for the court; good faith is not an issue in the absence of a specific duty, thus the question should not have been submitted to the jury.

We agree with the district court that the contractual issue of duty to decontrol is a question of law, and affirm the court's finding that no such duty can be found in the gas purchase agreements. The Act permitted, but did not require, parties to agree to deregulate. It merely set the stage for negotiations, and was not intended to give a seller the unilateral power to deregulate its wells early. The Act's legislative history speaks explicitly of the opportunity for existing contracts to be "voluntarily renegotiated." H.R. Rep. No. 101-29, at 2 (1989), reprinted in 1989 U.S.C.C.A.N. 51. In this sense, the Act cannot

properly be read as a governmental authority "prescrib[ing]" or "approv[ing]" a higher price. If Grynberg's claim was valid, it would undermine Congress' intent that the renegotiation provision be voluntary.

Finally, we note that Grynberg's reliance on Grynberg v. Rocky Mountain Natural Gas Co., 93-CA-0925 (Colo. App. Div. II, May 25, 1995) is misplaced. While the court in that case did find a duty to decontrol, the parties' agreement was significantly different from the gas purchase agreement at issue in this case. In Rocky Mountain, the gas purchase agreement was modified by a settlement agreement between the parties. The settlement agreement had a provision specifically requiring that the parties execute all documents and take all steps reasonably necessary to carry out the terms and intent of the settlement agreement. The context and language of the agreements are distinguishable from those in this case.

E. Ownership Interests

When Questar purchases gas, it pays the unit operator, which then divides the payment among the various working interest owners. At one point, Grynberg's working interest ownership percentage increased. Grynberg alleges that, although Questar paid for all of the gas it took from the unit, the records it sent to the operator did not reflect Grynberg's increased working interest ownership. As a result, the operator did not pay Grynberg the percentage he was

owed. Grynberg claims it was Questar's responsibility to make sure the records it sent to the operator accurately reflected the various working interests.

The trial court denied Questar's motion for summary judgment on this issue, and presented it to the jury, which awarded Grynberg $112,685.11. In ruling on Questar's motion for judgment as a matter of law, the court concluded that the issue should not have been submitted to the jury, because it was properly a dispute between Grynberg and the unit operator.

We agree with the district court's ruling on this matter, and uphold its ruling for Questar as a matter of law. Pursuant to the division order, Questar was obligated only to make payments for the gas to the operator. The operator explicitly agreed to account to all owners of the gas. Aplt. App. at 13258. Once it paid the operator for the gas, Questar's obligations were complete.

F. Stolen Gas Claim

Grynberg contends that Questar stole gas from Grynberg by installing valves on the wells that allowed gas to bypass sales meters. The court held a two-day hearing on a motion to strike Mr. Grynberg's declaration of opinions about the stolen gas. After granting this motion, the court dismissed the claim on summary judgment, finding that no evidence supported the stolen gas claim other than the conclusions and opinions of Mr. Grynberg.

Grynberg does not appeal the striking of Mr. Grynberg's opinion. Instead,

it argues that other evidence remaining in the record is sufficient to create a question of fact. In creating its appendix, Grynberg left out the hearing testimony of Questar's expert, as well as Mr. Grynberg's own hearing testimony. Because Grynberg claims that the district court's finding that there was no genuine issue of material fact was contrary to the evidence, it must "include in the record a transcript of all evidence relevant to that finding or conclusion." F.R.A.P. 10(b)(2). See also 10th Cir. Rule 10.1(A)(1) (Appellant required to "provide all portions of the transcript necessary to give the court a complete and accurate record of the proceedings related to the issue[] on appeal."). While we understand Grynberg's contention that this testimony need not be considered because sufficient evidence exists even without Mr. Grynberg's testimony, we are reluctant to overturn a district court's ruling without being able to examine the evidence or arguments it heard in making its ruling. Grynberg claims that a material question of fact is created by the numbers in Questar's "unaccounted-for gas reports" and other documents. In the absence of a complete record, we agree with the district court that, on the basis of the material in front of us, insufficient evidence exists to withstand a summary judgment motion.

G. Conclusion

We REVERSE the district court's reduction in damages on the take-or-pay contracts (counterclaim 1) and its grant of judgment as a matter of law on         the

breach of contract claim (counterclaim 2), the intentional interference with contract claim (counterclaim 3), and the price after deregulation issue. We AFFIRM the district courts grant of judgment as a matter of law on the duty to decontrol issue (counterclaim 4) and the working interest claim (counterclaim 5), as well as its grant of summary judgment on the stolen gas claim (counterclaim 6). We REMAND to the district court to enter judgment consistent with this opinion. The court's conditional grant of a new trial in the event of reversal is specifically overruled as unnecessary. See Fed. R. Civ. P. 50(c)(1).